Eastern District of Kentucky
**FILED**

AUG - 8 2005

At Ashland
LESLIE G. WHITMER
Clerk, U.S. District Court

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**ASHLAND DIVISION**
**CASE NO. 0:04-53-HRW**

APPALACHIAN FUELS, LLC                                         PLAINTIFF

v.

LOGAN & KANAWHA COAL COMPANY, INC.                            DEFENDANT

## APPALACHIAN'S PRE-TRIAL MEMORANDUM

Pursuant to this Court's November 30, 2004 Scheduling Order, Appalachian Fuels, LLC ("Appalachian") submits its Pre-Trial Memorandum.

**A.     Statement of the Facts of the Case:**

Appalachian and Logan & Kanawha Coal Company, Inc. ("L&K") never did business prior to the events in suit. In October 2003, Appalachian and L&K first began discussing the possibility of L&K's loading Appalachian's coal at L&K's CSX load-out. Thereafter, in January 2004, the parties began discussing the possibility of L&K's buying coal from Appalachian.

In late January 2004, L&K proposed to buy 220,000 tons of CSX-spec coal from Appalachian at $37.00 per ton, or $7.00 per ton below the then prevailing market price. During a January 28 telephone call, Appalachian's Jeff Lowe told L&K's Joe Czul, *inter alia,* that Appalachian would only consider L&K's below-market proposal if the parties could reach agreement on the load-out deal they had been discussing since October.

Following the parties' January 28 telephone conversation, L&K faxed a proposed purchase order to Appalachian which, by its plain terms, conditioned the effectiveness of the proposed agreement on Appalachian's signing and returning the proposed purchase order to

L&K. Immediately thereafter, L&K made numerous calls to Appalachian inquiring as to whether Appalachian would sign this purchase order, to which inquiry Appalachian's Jeff Lowe responded that the purchase order was under review by his bosses. At no time during these conversations did L&K advise Appalachian that, contrary to what it had stated in its fax (i.e., that there would be no agreement unless Appalachian affirmatively accepted the proposal in a signed writing), L&K would deem Appalachian's failure to deliver a written rejection as an acceptance of the proposal.[1]

On February 23 L&K wrote a letter to Appalachian which, for the first time, asserted that an agreement had been reached at the below-market price discussed in the parties' January 28 telephone call. According to L&K's February 23 letter, Appalachian was already in breach of this supposed agreement by failing to make the February deliveries and by failing to schedule additional deliveries. On or around March 1, Appalachian's Jeff Lowe telephoned L&K's Joe Czul to arrange a meeting to settle the dispute raised by L&K's February 23 letter.[2] On February 26, March 1 and March 5, L&K contracted for 70,000 replacement tons at well below the market price claimed by its expert. Thereafter, L&K utilized its affiliate's production, at a cost below the Appalachian contract price, to replace the remaining Appalachian tonnage.

---

[1] L&K also claims to have sent a January 28 fax outlining the terms of this proposal; however, Appalachian has no recollection of having received that fax at such time, and L&K has no proof of having sent the fax at such time. Moreover, even if sent, the January 28 proposal was revoked by L&K's February 5 proposal enlarging and modifying the terms of the January 28 fax. This is so because the February 5 proposal was faxed to Appalachian *before* Appalachian's alleged acceptance of the January 28 proposal by its failure to respond within 10 days. *See First Development Corp. v. Harmony Landing,* 959 F.2d 617, 621 (6th Cir. 1992)(Ky. law).

[2] The parties first met on March 10 in this regard; thereafter, negotiations continued through April 9, at which point they broke down.

**B.      Possible Questions of Fact[3]:**

1.  **Did the parties reach an oral agreement for Appalachian to sell 220,000 tons of CSX spec coal to L&K for $37.00 per ton, or $7.00 per ton below the market price for that coal on the date of the supposed agreement?**

2.  **Could Appalachian reasonably have understood that it needed to send L&K a written rejection to avoid being bound to the proposed contract terms set forth in L&K's January 28 and February 5 faxes when the February 5 fax stated, to the contrary, that those terms would not become effective unless Appalachian sent a signed written acceptance?**

3.  **Did L&K intend to authenticate its January 28 fax to Appalachian by its use of its affiliate corporation's letterhead?** See Appalachian's July 5, 2005 Response to L&K's Motion for Partial Summary Judgment, pp. 14-17.

4.   **What portion of the 220,000 tons of Appalachian's alleged contracted for coal did L&K cover by the procurement of substitute goods?**

5.  **With regard to the cover coal identified in the proceeding question, did L&K suffer any damages, determined by the difference between the cost of cover and the contract price plus any sales revenues which: (1) L&K lost as a foreseeable and direct result of Appalachian's non-delivery and (2) could not have prevented by cover or otherwise?**

6.  **With regard to any portion of the 220,000 tons that L&K did not cover, did L&K suffer damages, determined by the difference between the market price at the time**

---

[3] For the reasons set forth in its Motion for Summary Judgment, Appalachian does not believe that there are any fact questions that need to be resolved at trial.

when the buyer learned that Appalachian did not consider itself bound and the contract price?

L&K claims that it learned of Appalachian's "breach" on March 10, when the parties met to settle their dispute. Notably, the market was at its peak on March 10.

Appalachian claims that L&K knew that Appalachian disputed L&K's supposed contract long before March 10. It certainly knew by February 23, when L&K wrote its demand letter to L&K complaining of: (1)Appalachian's refusal to sign the proposed purchase order; (2)Appalachian's failure to make the February deliveries; and (3)Appalachian's failure to return L&K's calls to schedule future deliveries. And it certainly knew by March 1, when Jeff Lowe called Joe Czul to schedule a meeting to settle the dispute raised by the February 23 letter.

Alternatively, if the appropriate date is when L&K became *certain* of Appalachian's unwillingness to perform, that date should be April 9, when settlement broke down, not March 10, when settlement talks began. The market was lower on February 23, March 1 or April 9 than it was on March 10.

7.      **Did L&K confer any benefit on Appalachian that it would be unjust for Appalachian to retain?**

**C.  Questions of Law:**

1.      **Do L&K's memoranda satisfy the requirements of KRS 355.2-201(2)?** This question is fully briefed in the parties' competing Motions for Summary Judgment.

2.      **If so, did Appalachian's failure to respond serve to preclude Appalachian from denying the existence of the agreement, or did it only preclude Appalachian**

4

**from challenging the agreement on statute of frauds grounds?** Again, this issue is fully briefed in the parties' competing Motions for Summary Judgment

3.  **Is the purported contract set forth in L&K's purchase order void for lack of mutuality of obligation and remedy?**

If this Court determines that Appalachian is bound to the terms of L&K's proposed purchase order by its failure to respond, then Appalachian intends to show that the contract thus created was void for want of mutuality. Indeed the contract, by its plain terms, only binds Appalachian - - not L&K: "Provisions by Seller [Appalachian] of goods and/or services ordered hereunder may be terminated by Logan & Kanawha Coal Co., Inc. at its option in whole or in part at any time..."

Kentucky law is clear that such a "contract" fails for lack of mutuality. *See Rehm-Zeiher v. F.G. Walker*, 156 Ky. 6, 160 S.W. 777 (1913)(multi-year contract for the purchase and sale of whiskey at pre-established prices which gave the wholesaler complete discretion regarding its purchase obligation was not a valid contract because it was not mutually binding upon the parties); *see also Louisville Tobacco Warehouse Co. v. Ziegler*, Ky., 244 S.W. 899, 901(1922)("the terms of a contract, to be enforceable, must be mutually binding upon all parties thereto."); *Baber v. Lay*, Ky., 305 S.W. 2d 912, 913(1957) ("mutuality is an essential part of an executory contract, and when one party is not bound to the agreement then neither party is bound for lack of mutuality").

4.  **Is L&K entitled to utilize the measure of damages set forth in KRS 355.2-713, *i.e.*, the difference between market price and contract price, for that portion of Appalachian's tonnage that it covered from its own production?**

As set forth in Appalachian's July 18, 2005 Reply to L&K's Response to Appalachian's Motion to Compel, self-cover constitutes cover under UCC 2-712. Accordingly, pursuant to UCC 2-712's plain terms, L&K cannot use the remedy provided in UCC 2-713 for tonnage that it covered—either from its own production or from third-party purchases. This result does not unfairly deprive L&K of the ability to recover the additional profits it says it would have made had Appalachian delivered its 220,000 tons; it merely requires L&K to prove that it would have made these supposed additional profits. *See Dura-Wood Treating Co. v. Century Forest Industries, Inc.* 675 F. 2d 745, 754-55 (5th Cir. 1982) (holding, in a self-cover case, that party seeking to recover sales revenues it claims to have lost by utilizing its production for cover rather than for market sales must proceed under UCC 2-715.)

As such, it is not enough for L&K to blandly assert that it could have sold all of the coal it obtained to cover Appalachian's deliveries at full market prices. Pursuant to UCC 2-712 and UCC 2-715, L&K can only recover damages for lost market sales if it can prove that: (1) it could have effectuated these additional sales at full market prices; (2) this fact was reasonably foreseeable to Appalachian and (3) L&K could not have avoided its lost sales revenue by a different form of cover or otherwise. *Id.* at 755.

5. **Is promissory estoppel an exception to the statue of frauds and, if so, did L&K rely to its detriment on any oral promise by Appalachian and, if so, what was L&K's loss as a result of that reliance.**

6

**D. Expected Evidentiary Objections**:

### 1. L&K's expert should not be allowed to testify as to his opinion of the date that damages should be measured under KRS 355.2-713.

As indicated above, L&K claims that self-cover is not cover under KRS 355.2-712 and that, as such, it is entitled to recover damages under KRS 355.2-713, measured as the "difference between the market price *at the time when the buyer learned of the breach* and the contract price..." L&K then proposes to offer the opinion of its expert, Seth Schwartz, that March 10 is the appropriate date because: (1) the legal standard should be when "the party that thought there was a contract...[learned]...that the counter party either did not believe there was a contract or had no intention of performing that contract" and (2) "March 10 was my understanding when Appalachian Fuels communicated to L&K that they did not think that they had a contract..." [Schwartz depo., pp. 61, 108-09.] [4]

The governing legal authorities plainly preclude such "expert opinion." First, it is settled that an expert cannot give an opinion on the applicable law, since that would intrude on the judge's rule. *See, e.g., CMI-Trading v. Quantum Air, Inc.*, 98 F. 3d 887, 890 (6th Cir. 1996); *Loeb v. Hammond*, 407 F. 2d 779 (7th Cir. 1969); *Marx & Co. v. Diners Club, Inc.*, 550 F. 2d 505 (2d Cir. 1977); *Employers Reinsurance Corp. v. Mid-Continent Casualty Co.*, 202 F. Supp. 2d 1212 (D. Kan. 2002). Second, it is settled that an expert cannot offer his view of the evidence unless it is supported by some specialized non-legal knowledge not possessed by the jury. *See Violas v. GMC*, 73 F Supp. 2d 452 (D.N.J. 1999); *Torres v. K-Mart Corp.*, 145 F. Supp. 2d 161 (D.P.R. 2001); *Paul Morelli Design v. Tiffany & Co.*, 200 F. Supp. 2d 482 (E.D.Pa. 2002); *see*

---

[4] *See also* Schwartz depo. pp. 109-111 (relevant excerpts from Schwartz's deposition are attached at TAB A). As noted above, pp. 3-4, the evidence supports various dates other than March 10—on which dates the market was lower—as the date that L&K learned that Appalachian did not believe there was a contract.

*also Specht v. Jensen*, 853 F. 2d 805, 807-09 (10th Cir. 1988)(error to allow expert to testify about how the law should be applied to the facts of a particular case); *Mossey v. Pal-Tech, Inc.*, 231 F Supp. 2d 94, 98 (D.D.C. 2002)(same).

In this case Mr. Schwartz did not even try to suggest that his view of the evidence was based on his expertise in coal markets; to the contrary, he admitted it was based on his "experience in many other UCC cases and working with judge's opinions and other lawyers." *Id*, p. 111; *see also id.* p. 62 ("[my opinion] is based upon my years of experience with the Uniform Commercial Code with regard to coal contract transactions, working with many different attorneys and reading judges' opinions, developing an understanding of what the Code intends…")

Appalachian has no problem with Mr. Schwartz' calculating damages based on a March 10 breach date. However, he should not be entitled to give his "opinion" as to why that is the appropriate date under the law for measuring damages.

### 2.  L&K should not be permitted to offer testimony and documentation concerning its internal communications to prove that Czul told his colleagues there was a deal.

Appalachian believes that L&K will seek to offer testimony from its own witnesses as to their conversations with L&K's Joe Czul in order to establish that Czul thought he had a contract after talking to Jeff Lowe.  L&K will also seek to introduce Czul's notes of his conversations with Mr. Lowe and its own witnesses' notes of their conversations with Czul for this purpose.  Appalachian will object on hearsay grounds to any such evidence.  Pursuant to Rule 801(d)(1), F.R.E., Czul's alleged prior consistent statements are only admissible when offered to rebut an express or implied charge of recent fabrication or improper influence or motive.  Pursuant to Rule 803, F.R.E., Czul's conversations with his associates, Czul's documenting of his own conversations and Czul's associates' documenting of their

8

conversations with Czul are not allowed under the business records or any other hearsay exception.

**E.  Pending Motions:**

**1. Appalachian's Motion for Summary Judgment (Docket Entry No. 39).**

**2. Appalachian's Motion to Compel (Docket Entry No. 44).**

**3. L&K's Motion for Partial Summary Judgment (Docket Entry No. 47).**

Respectfully submitted:

Barry Hunter
Frost Brown Todd LLC
2700 Lexington Financial Center
250 West Main Street
Lexington, Kentucky  40507
Telephone:  (859) 231-0000
Facsimile: (859) 231-0011

*COUNSEL FOR PLAINTIFF,*
*APPALACHIAN FUELS, LLC*

## CERTIFICATE OF SERVICE

This is to certify that a true and accurate copy of the foregoing was served upon the following counsel of record via E-mail and U.S. Mail on this the _____ day of August, 2005:

> Samuel D. Hinkle, IV
> R. Eberley Davis
> Adam T. Goebel
> Stoll, Keenon & Park, LLP
> 2650 AEGON Center
> 400 West Market Street
> Louisville, KY 40202
> *Counsel for Defendant and Counter-Plaintiff*
> *Logan & Kanawha*

_____
Attorney for Plaintiff

Lexlibrary 0014202.0534137 270353v.1

10